

**ORIGINAL**    **United States District Court**
NORTHERN DISTRICT OF GEORGIA

UNITED STATES OF AMERICA

v.                                                    **CRIMINAL COMPLAINT**

XIAOJIANG LI                                          Case Number: 1:19-MJ-1007

I, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief.  Beginning on or about January 1, 2015, and continuing until August 31, 2015, in DeKalb County, in the Northern District of Georgia,

defendant Xiaojiang Li, being an agent of Emory University, an organization receiving in the one year period between September 1, 2014, and August 31, 2015, benefits in excess of $10,000 under a Federal grant sponsored by the National Institute of Health for studies of synaptic toxicity of Huntington Disease Protein, embezzled, stole, obtained by fraud, and intentionally misapplied property worth at least $5,000 that was under the care, custody and control of said organization, that is, approximately $34,488.08 in salary and fringe benefits,

in violation of Title 18, United States Code, Section 666(a)(1)(A).

I further state that I am a(n) Special Agent and that this complaint is based on the following facts:

PLEASE SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof.    Yes

_____
Signature of Complainant
Andrew L. Igo

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it.  Sworn to before me, and subscribed in my presence

November 21, 2019                              at     Atlanta, Georgia
_____                         _____
Date                                              City and State

JANET F. KING
UNITED STATES MAGISTRATE JUDGE
_____                         _____
Name and Title of Judicial Officer                Signature of Judicial Officer
AUSA Samir Kaushal / 2019R00996

## **AFFIDAVIT**

I, Andrew L. Igo, being first duly sworn, hereby depose and state as follows:

### **Introduction and Agent Background**

1.      I make this affidavit in support of a criminal complaint for **Xiaojiang Li**. Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 666(a)(1)(A), entitled "Theft or bribery concerning programs receiving Federal funds," have been committed by **Li**.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since 2007. I am currently assigned to the Counterintelligence squad of the Atlanta Field Office, which investigates violations of federal laws, including economic espionage and theft of trade secrets. During my employment with the FBI, I have conducted a variety of counterintelligence investigations. I have attended numerous trainings and am familiar with a wide variety of investigative techniques used in counterintelligence investigations.

3.      This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint and arrest warrant and does not set forth all of my knowledge about this matter.

### **Relevant Statute**

4.      Title 18, United States Code, Section 666 states in relevant part:

(a) Whoever, if the circumstance described in subsection (b) of this section exists—
(1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—

1

(A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that—
(i) is valued at $5,000 or more, and
(ii) is owned by, or is under the care, custody, or control of such organization, government, or agency; or
(B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more; or
(2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;
shall be fined under this title, imprisoned not more than 10 years, or both.

(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.[1]

## Probable Cause

5.      The National Institutes of Health ("NIH"), a part of the U.S. Department of Health and Human Services, is the nation's medical research agency. NIH is made up of 27 different components, each with its own specific research agenda, often focusing on

---

[1] The crime has four elements: (1) the defendant must be an agent of an organization, "(2) [the defendant needs to have] embezzled or otherwise knowingly converted to his own use property owned by or under the care, custody, or control of [the organization]; (3) the embezzled or converted property [needs to have a] value of $5000 or more; and (4) 'during a continuous one-year period beginning no earlier than one year [before the defendant's unlawful] conduct and ending no later than one year after the conduct, [the organization needs to have] received in excess of $10,000 under a federal program involving federal assistance monies. *United States v. Chafin*, 808 F.3d 1263, 1269–70 (11th Cir. 2015); *see* 11th Circuit Pattern Jury Instruction, Offense Instruction 24.1.

particular diseases or body systems. NIH is the largest public funder of biomedical research in the world, investing more than $32 billion a year to enhance life, and reduce illness and disability by providing research grants to various entities.

6.      Emory University is a private research university with a main campus in Atlanta, Georgia.

7.      **Li** was a professor at Emory University who conducted research pertaining to neurodegenerative diseases. **Li** was a professor in the Department of Human Genetics.

8.      In or about October 2018, NIH notified Emory University that NIH had become aware that applications submitted to NIH for **Li** may have failed to comply with NIH policies regarding other support, disclosing foreign financial interests, and/or obtaining prior approval from NIH for the use of foreign components on NIH research grants.

9.      In response, Emory University discussed the matter with **Li** on more than one date between October 2018 and May 2019. Additionally, in or about January 2019, Emory University initiated an internal review of **Li's** Emory University email account. **Li's** emails revealed his association with the Chinese government's "Thousand Talents Program."[2]

10.     While employed at Emory University, from 01/01/2015 through 08/31/2015, **Li** served as Principal Investigator on three NIH grants:

        a.  Nuclear Toxicity of Huntington Disease Protein

---

[2] The Thousand Talents Program is a talent recruitment program that encourages the transfer of original ideas and intellectual property from U.S. universities to China.

3

b.   Neuronal Function of Huntington Associated Protein

c.   Synaptic Toxicity of Huntington Disease Protein

11.   According to Emory University officials:

a. . Faculty are paid a salary. Faculty are paid monthly from funds allocated based on the faculty member's estimates of how she would spend her time. Faculty salary can be paid by departmental funds and through sponsored awards, including grants. Normally, time spent teaching is charged to departmental funds and time spent researching is charged to the specific federal grants or other sponsored award funding the research.

b.   Faculty are required to certify their effort semiannually in Emory University's "Effort Reporting System." The "Effort Reporting System" certifies how a faculty member was paid and allows faculty to make corrections to their estimated time allocations for funding—i.e. from which source of funds salary should be paid, departmental funds, federal grants, or other funds.

c.   Full-time equivalency ("FTE") reflects the amount of time the faculty member devoted to Emory University matters (teaching, research, etc.). An FTE of one means that the employee is spending all of her time working on Emory University matters and other approved activity, and the employee would receive full salary payments for that time frame. The employee's FTE is less than one if the employee is involved in outside employment or other approved matters that prevent them from providing full time to Emory University. A reduction in FTE results in a reduction in

4

Emory University salary for the time frame. For example, if an employee is only half-time at Emory, her FTE would be reduced to .5 and her salary for that time frame would be 50 percent of her full-time salary.

12.　　Emory University provided the FBI with a letter, dated 12/15/2011, addressed to **Li** from Xue Yongbao of the Institute of Genetics of the Chinese Academy of Sciences ("CAS"). The letter provided notification to **Li** that his application for a "Thousand Talents Program" position was approved. According to the letter, **Li** would be appointed the position of Research Team Leader at the Institute of Genetics and Developmental Biology of CAS. The Institute agreed that **Li** would work in China for six months or more before 01/01/2014 as part of a transition period. The purpose of the transition period was so **Li** would have "sufficient time to build a large animal experimental platform and team and undertake important national issues." **Li** was to assume his position full-time (9 months each year) before 01/01/2014.

13.　　Emory University also provided the FBI with a "High-level Talent (Transition Period) Employment Contract" between the Institute of Genetics and Developmental Biology of CAS (Party A) and **Li** (Party B), executed on 12/20/2011. The term of the contract was two years, from 12/30/2011 to 12/30/2013. According to the contract, Party A was to employ Party B to work in the position of Researcher to:

    a.　Actively develop scientific research, enhance the Institute's non-human primate models, and research the academic influence of relevant fields such as outbreak mechanism of illnesses and treatment targets.

    b.　Actively apply to the state for major research funding and corresponding support that it may obtain.

    c.   Actively participate in the relevant activities such as courses and scientific research organized by the Institute.

14.    The contract stipulated that Party B work for Party A each year not less than six months. The "salary and benefits" section of the contract stated that "Party A shall fully pay monthly salary to Party B in monetary form, in accordance with national policies and relevant provisions of the department."

15.    On or about February 10, 2015, **Li** began pursuing part-time status at Emory University to work at CAS. **Li** and the Emory University Department of Human Genetics Chairman entered into a "A letter of understanding." The letter stated:

> This letter is to indicate that Dr. Xiao-Jiang Li, tenured professor in Department of Human Genetics at Emory University, is willing to be on part-time status with effort of 0.5 FTE from January 1, 2015 to December 31, 2016, based on a new police (sic) from School of Medicine at Emory University that permits tenured faculty to convert to part-time status without a loss of tenure. By doing so, Dr. Xiao-Jiang Li will be able to spend more time to lead research projects on neurological diseases at the Institute of Genetics and Developmental Biology at Chinese Academy of Sciences.
>
> Dr. Li understands that part-time status needs to be consonant (sic) with the needs of the Department of Human Genetics and that his full-time status with tenure can be reverted if the part-time status is not renewed. Accordingly, Dr. Li has discussed with Departmental Chair for approving his part-time status and will also discuss for resuming full-time status or extending part-time status before the conclusion of the approved period.
>
> From January 1, 2015 to December 31, 2016, Dr. Li will travel between the U.S. and China to maintain his 6-months efforts on his NIH R01 grants. Thus, his salary at Emory University will be reduced to half of his current salary effective as of February 1, 2015 till December 31, 2016, and his lab space and office at Emory University remain the same.

16.    According to Emory University officials, however, this letter of understanding was merely the starting point for negotiating an agreement to allow **Li** to work part time at Emory University, and not a final agreement. Li never completed the

necessary follow-ups, including finalizing an inter-institutional agreement. **Li's** FTE was not reduced to 0.5 starting on January 1, 2015, as the letter stated.

17.    Despite never completing the process of going part-time at Emory University to work at CAS, **Li** still worked at CAS in 2015. According to Emory University, during the course of communications in which Emory University was examining the NIH allegations in late 2018 and early 2019, **Li** stated that he was unable to provide payment or attendance records for the time he worked at CAS; however, **Li** did provide Emory University the previously mentioned contract and two letters from Jing Wang, the Human Resources Director at the Institute of Genetics and Developmental Biology, CAS:

      a.  The first letter, dated 01/21/2019, stated that **Li** worked on transgenic large animal models at CAS from 01/01/2012 to 12/31/2016. Between 01/01/2012 and 02/28/2015, **Li** received daily compensation at 80,000 CNY per 22 working days before tax (26.02%). **Li** received compensation of 553,679 CNY after tax from 03/01/2015 to 12/31/2015 and 569,070 CNY after tax from 01/01/2016 to 12/31/2016. The letter stated that **Li's** working time did not include his vacation in China and since **Li** left the institute more than two years ago, they did not have other detailed financial information for his compensation.

      b.  The second letter, dated 03/06/2019, provided **Li's** daily compensation from the Institute of Genetics and Developmental Biology, CAS between 01/01/2012 and 02/28/2015 as 16 payments, each 80,000 CNY before tax (26.02%) per 22 working days.

18.     Although **Li** was receiving compensation from CAS in 2015, he reported

to Emory University in an "Annual Certification: External Activity and Research

Summary," dated 04/26/2016, that he received no compensation and expected to receive

no compensation from CAS for the date range of 01/01/2015 through 12/31/2016. The

Annual Certification document had an electronic certification statement section at the end

that stated:

> By submitting this form, I <u>Xiao-Jiang Li</u> , certify (please check each
> box to confirm your affirmative response to each statement):
>
> The above information is submitted by me, not a proxy or surrogate,
> and my electronic signature above certifies that.
>
> The above information is true to the best of my knowledge.
>
> I understand that I have an obligation to inform my Chair and Dean in
> writing if my answers to any of the above questions change during the
> academic calendar year.
>
> I agree to comply with the policies and procedures of Emory
> University and/or Emory Healthcare as applicable, related to Conflict
> of Interest and annual certification requirements.
>
> I also certify that I have read and understand the School of Medicine
> Policy on Industry and Other External Professional Relationships

19.     Aside from CAS, there is evidence that **Li** was engaged in other outside

employment in China.

    a.     On or about 8/24/2015, **Li** received an email from

renke.dai@pharmass.com.cn with an attachment asking for guidance. The

attachment was a presentation titled "Animal Model Development and

Drug Evaluation Platform Company Business Plan." The presentation

provided a business profile for the Guangzhou Yuanxi Biotechnology Co.,

Ltd. (Yuanxi Biotech). **Li** was listed as the Chief Scientist for Yuanxi

Biotech and part of the "National Thousand Talent Plan."

    b.  On 07/18/2016, **Li** received an email from 906323252@qq.com asking

him to review and revise an attachment titled "Entrepreneurship Leading

Team Application." The attachment was a "2016 Guangzhou Innovative

Entrepreneurship Leading Team Application" for the Guangzhou Yuanxi

Biotech Co., Ltd. **Li** was identified as the project team lead. Several of

**Li's** full-time and part-time positions were listed, including the following

full-time and part-time positions:

        i.  Full time: 2009- current, Institute of Genetics and Developmental

Biology, Chinese Academy of Sciences, Researcher

       ii.  Part time: 2015-current, Yuanxi Biotech Co., Ltd., Chief Scientist

20.    **Li's** reported FTE at Emory University from 01/01/2015 to 02/28/2015

and 03/01/2015 to 08/31/2015 was 1.0, meaning that he was supposed to be working full

time for Emory University during those time frames.

21.    A review of **Li's** travel records show that, even though his FTE at Emory

University was 1.0 from 01/01/2015 to 02/28/2015 and 03/01/2015 to 08/31/2015

(approximately 242 days), **Li** was out of the country for 146 days where his outbound

destination was China (approximately 60 percent of the time) during this time period:

    a.  29 days from January 2-31, 2015

    b.  31 days from March 4, 2015 through April 4, 2015

    c.  40 days from April 21 2015 through May 31, 2015

    d.  27 days from July 5 through August 1, 2015.

    e.   19 days from August 12-31, 2015

22.    **Li** certified his effort at Emory University as 100% on 07/22/2015 and 11/18/2015:

    a.   On 07/22/2015, **Li** certified 71% of his effort working on federal grants and 29% teaching for the time period of 09/01/2014 through 02/28/2015.

    b.   On 11/18/2015, **Li** certified 75% of his effort working on federal grants and 25% teaching for the time period of 03/01/2015 through 08/31/2015.

23.    For 01/01/2015 to 02/28/2015 and 03/01/2015 to 08/31/2015, even though **Li** was in China approximately 60 percent of the time and had a paid position at CAS at that time, **Li** received the following payments—while maintaining a reported FTE of one—from the NIH grants as salary and fringe benefits from Emory University:

    a.   Nuclear Toxicity of Huntington Associated Protein

        i.   Salary: $32,397.04

        ii.   Fringe Benefits: $7,969.68

    b.   Neuronal Function of Huntington Associated Protein

        i.   Salary: $32,397.04

        ii.   Fringe Benefits: $7,969.68

    c.   Synaptic Toxicity of Huntington Disease Protein

        i.   Salary: $27,679.04

        ii.   Fringe Benefits: $6,809.04

24.    On January 10, 2019, **Li**, in communicating with Emory University officials about his NIH grants, stated via email: "For my past efforts on my NIH grants,

10

they are overcommitted, as they are much more than my efforts on the approved NIH grants."

      25.     Based on the information contained in this affidavit, I submit that there is probable cause for the requested criminal complaint charging a violation of Title 18, United States Code, Section 666(a)(1)(A).